AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

V.

Jarbir Javier Velasquez
DOB: 2/10/1975
(Name and Address of Defendant)

**ORIGINAL**

## CRIMINAL COMPLAINT

CASE NUMBER: 2004-M-0496-RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __August 21, 2004__ in __Essex__ county, in the _____ District of __Massachusetts__ defendant(s) did, (Track Statutory Language of Offense) knowing and in reckless disregard of the fact that certain aliens have come to, entered, or remain in the United States in violation of law, transport and move and attempt to transport and move such aliens within the United States by means of motor vehicle transportation, in furtherance of such violation of law

in violation of Title __8__ United States Code, Section(s) __1324(a)(1)(A)(ii)__.

I further state that I am a(n) __Special Agent, ICE__ and that this complaint is based on the following facts:
Official Title

See attached affidavit of Michael Perrella

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
Signature of Complainant
MICHAEL PERRELLA

Sworn to before me and subscribed in my presence,

OCT 1 3 2004   at 3:11 pm
_____
Date

at   Boston, MA
     City and State

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT OF SPECIAL AGENT MICHAEL PERRELLA

I, Michael Perrella, having been duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with Immigration and Customs Enforcement ("ICE"), formerly the United States Immigration and Naturalization Service ("INS"), and have been so employed since May of 1996. Among other duties, I am assigned to investigate alien smuggling organizations and practices.

2. I am aware that transporting or attempting to transport an alien who is present in the United States in violation of law, knowing or in reckless disregard of the alien's illegal status, is a violation of Title 8, United States Code, Section 1324 (a)(1)(A)(ii).

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and agents of this agency. This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation but is submitted in support of an application for a criminal complaint against Jarbir Javier Velasquez, d.o.b. 02/10/1975 ("Jarbir"), and Jaime R. Pillcorema, d.o.b. 08/25/1976 ("Jaime"), charging both with a violation of 8 U.S.C. §1324 (a)(1)(A)(ii).

**OVERVIEW OF ALIEN SMUGGLING**

4. From my training and experience, I know that, while no cases are alike, there are usually several different individuals and means of transportation that an alien will encounter throughout the smuggling route from their home country to the United States border, and then to the final destination within the United States from their home country.

5. For example, once a smuggled alien reaches the United States, the alien will usually be taken to a "safe house" or "drop house." Here, a group of smuggled aliens will wait until they can be moved either to their final destination or another "safe house." When the group is ready to be moved, they may be taken to a staging location at which point, they will meet one or more guides, also known as "coyotes," who will transport them to either another or their final locations.

6. Aliens also pay, in some form or fashion, in order to be smuggled into the United States. The manner and means of payment also vary. For example, an alien may pay a sum up front while still in their home country, and pay the balance upon reaching their final destination.

**THE INSTANT OFFENSE/ENCOUNTER WITHIN THE UNITED STATES**

7.  On Monday, August 23, 2004, ICE Boston received information that a passenger van, blue in color, bearing New York license plate CMP 2717, was encountered by police in Lynn, Massachusetts. The van was alleged to contain multiple foreign nationals illegally present within the United States. According to Lynn police, they were notified by Irma Matul ("Matul"), of Lynn, MA, that her nephew, Rony Guzman ("Guzman") was being held in the van until she paid the remainder of the fee to smuggle him from his native Guatemala to Lynn. The fee amount was first said to be $1700.00 USD.

8.  Lynn police advised that when they arrived at 330 Boston Street, (the location provided by Matul), they discovered Rony Guzman in the blue, New York plated van. Guzman was still sitting in the rear passenger compartment of the vehicle. Velasquez and Pillcorema were found in the driver and passenger compartments of the vehicle. Both Velasquez and Pillcorema were detained by Lynn Police and held at Essex County House of Corrections in Middleton, MA on kidnapping charges.

9.  Lynn police stated that Guzman told them that he was in the vehicle with Jaime and Jarbir because they would

3

not let him go until $1700.00 was paid by his aunt, Matul. He further stated that he was coming to the United States illegally from Guatemala.

10. Lynn police read Jaime and Jarbir their Miranda warnings at the scene, and both advised that they understood. Jaime and Jarbir told Lynn police that they were part of a transportation company servicing the Northeast. When asked the name of the company, neither could answer. They further stated that they were waiting for a female to arrive and pay them.

11. At the scene, Jaime, without being asked, told police that he wanted to tell the truth. He stated that he had transported Guzman, Eduardo DeLeon, and another three illegal aliens from New Jersey to Lynn. However, he stated that the others had departed prior to the arrival of the police.

12. Lynn Police seized $4,073.00 USD from the Jaime and Jarbir, along with a notebook containing telephone numbers, names and dollar amounts.

**THE PASSENGERS/ALIENS**

13. During the course of this investigation, ICE agents determined that there were four 4 other "passengers" in the vehicle prior to the arrival of the Lynn police.

14. During the course of the investigation, ICE agents also determined that Guzman is a citizen and native of Guatemala. Guzman claims to have crossed the US/Mexico border illegally as part of an organized effort to smuggle him into the United States.

15. Guzman claims to have paid a smuggler in Guatemala $2000.00 USD to be smuggled from Guatemala to San Antonio, Texas. At San Antonio, he claims that smugglers charged an additional $1500.00 USD for travel from San Antonio to New Jersey. He claims that the smugglers received this money from his aunt, Matul.

16. After the fee was paid, he traveled from San Antonio to New Jersey, where he was picked up by a van driven by Jaime and Jarbir. He was not charged any additional money at this time, but was aware that additional money was to be paid for his trip from New Jersey to Lynn. Guzman further claims that he was told if the money was not paid, he would be sent back. Guzman claims that he was

picked up in a blue van and inside the van were already four other passengers.

17. At Lynn, Guzman stated that the four other passengers were picked up and he witnessed an unidentified individual pay a large amount of money to one of the drivers when the other four passengers departed.

18. After waiting in the parked vehicle, the driver told him that they called his aunt. They asked why she was late. They further advised that if the aunt did not pay, they would take him back to Mexico. After 15 minutes, the Lynn police arrived and arrested the drivers.

**INTERVIEWS WITH JAIME PILLCOREMA AND JARBIR VELASQUEZ**

19. After being advised of his rights, and after agreeing to waive those rights, Jaime spoke with investigators. A summary of the information provided by Jaime is as follows: He admitted that he and Jarbir were paid to drive from the NY/NJ area into New England, including Massachusetts. When asked who he works for, he stated that he works for Fernando Estrada who receives people. He claims that he has worked at least three weekends in the past picking up people for Estrada and transporting them to New England. He claims that Estrada pays him $180.00 USD if he uses his personal vehicle and if

he uses Estrada's vehicle he receives $100.00 USD. He claims that he picks up people on the New Jersey Turnpike between exits 8 and 12. On this particular occasion, he met two different Texas registered vehicles at two different locations, and picked up five total passengers. Upon picking up the passengers, he received a list of names and a dollar amount of how much money was still owed and to be collected for each person. In addition, he received names and telephone numbers of persons to contact at a final, predetermined location. Upon arriving at a specific location, money was to be collected and then forwarded to Estrada. At the final destination, if money was not collected from the point of contact, he claims that he would have to call Estrada for further instructions. When asked if he was aware of any illegal activity, he claims that after speaking with his father, he believed that something illegal was going on. However, he decided to do it again in order to make enough money to buy his daughter a gift.

20. After being advised of his rights, and after agreeing to waive those rights, Jarbir spoke with investigators. A summary of the information provided by Jarbir is as follows: He admitted that he and Jaime were paid to drive from the NY/NJ area into New England including

Massachusetts. When asked who he works for he stated "Fernando Estrada." Velasquez claims that he was paid $80.00 dollars for the trip from NJ to Lynn. He claims that he and Jaime picked-up five people on the New Jersey Turnpike, at two different locations, who were dropped-off by Texas registered vehicles. Jarbir claims that he was advised that each passenger owed $700.00 USD plus an additional $75.00 USD, which was to go to Jaime and himself. He further stated that all the information, to include monies owed, phone numbers and points of contact, were all written down. He claims that his job on this specific trip was to make phone calls and collect money. He stated that he collected $3100.00 USD for earlier passengers and was to return that money to Fernando Estrada. When asked about the passengers, he claimed everyone spoke Spanish. He only spoke with them about their final destination and asked if they wanted food. He claimed that he was not sure if they were illegal. However, when asked if he thought $700.00 USD was an excessive amount for travel from NJ to MA, he stated that "since most don't have documents that is what is paid." Jarbir further claimed that Fernando told both he and Jaime that no one leaves the van without paying. He claims on most trips there were no issues with collecting the fee.

8

If an issue did arise while trying to collect, they would phone Estrada.

**INTERVIEW WITH IRMA MATUL**

21. Matul claims to be the aunt of Guzman. She claims that she received a phone call from a smuggler in San Antonio, Texas and was told to pay $1500.00 USD as part of a smuggling fee for getting her nephew into the country. She advised that she sent the money via Money Gram in the name of "Jennifer Gomez." She then received a second call asking for $400.00 USD for his transportation to the Northeast. A third call advised that the fee would be $700.00 for his trip, plus an additional $100.00 USD. After being advised that she could pay the fee upon his arrival to Lynn, she received a call on Saturday, August 21, 2004, saying that Guzman had arrived at 330 Boston St, Lynn, MA. She claims that prior to hearing of his arrival, she phoned the Lynn police and advised them of the situation. She believed that the drivers of the vehicle would not release Guzman unless $800.00 USD was paid. She believed this because she was told earlier that if she did not pay, Guzman would sent back to Mexico.

22. Based on the foregoing information, I believe probable cause exists to conclude that Jaime Pillcorema,

9

d.o.b. 08/25/1976, and Jarbir Velasquez, d.o.b. 02/10/75, did, on or about August 21, 2004, knowing and in reckless disregard of the fact that certain aliens have come to, entered, and remain in the United States in violation of law, transported or moved or attempted to transport or move such aliens within the United States by means of transportation or otherwise, in furtherance of such violation of law, in violation of 8 U.S.C. §1324(a)(1)(A)(ii).

_____
Michael S. Perrella
Special Agent
United States Immigration
And Customs Enforcement

Subscribed and sworn to before me this 13th day of October 2004.

_____
ROBERT B. COLLINGS
United States Magistrate Judge